FILED

5/1/2020

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: _____
                      DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § | |
| § | |
| Plaintiff. § | |
| § | |
| v. § | CRIMINAL NO. **1:20-CR-123-RP** |
| § | |
| BLUE BELL CREAMERIES, L.P., § | |
| § | |
| Defendant. § | |

## PLEA AGREEMENT

The United States Department of Justice, Consumer Protection Branch ("government"), by and through the undersigned Trial Attorneys, and Defendant, BLUE BELL CREAMERIES, LP ("Blue Bell" or "Defendant"), by and through Douglas A. Fellman, Attorney for Defendant, enters into the following plea agreement pursuant to Rule 11(c)(1)(C), Federal Rules of Criminal Procedure:

**1.  Defendant's Agreement to Plead Guilty**

Defendant, being fully cognizant of Defendant's rights, agrees to plead guilty to a two-count information that charges Blue Bell with two misdemeanor violations of Title 21, United States Code, Sections 331(a), 333(a)(1), 342(a)(1) and 342(a)(4), arising from Defendant's introduction of adulterated foods into interstate commerce between January 1, 2013 and April 20, 2015.

**2.  Penalties and Sentencing Matters**

The parties jointly agree that this plea agreement is made pursuant to Fed.R.Crim.P. 11(c)(1)(C), and that the following specific sentence is the appropriate disposition of this case. The parties jointly request that the Court, at a hearing to be scheduled at an agreed-upon time, impose the following specific sentence. Taking into consideration the factors set forth in 18 U.S.C. §§ 3553(a), 3571(d) and 3572, the agreed-upon sentence is as follows:

A.  Defendant agrees to pay a criminal fine of $9,350,000 to the Clerk of the United States District Court within five business days of the Court's entry of the judgment and conviction. The parties agree that the fine provisions of the United States Sentencing Guidelines (U.S.S.G.) do not apply to organizational defendants for misdemeanor violations of the Federal Food, Drug, and Cosmetic Act, pursuant to U.S.S.G. § 8C2.1


B.      Defendant agrees to forfeit $7,900,000, which it will pay to the United States Marshals Service Asset Deposit Fund, within five business days of the Court's entry of judgment and conviction. Defendant agrees to sign any documentation necessary to accomplish the forfeiture.

C.      Defendant and the government agree that the fine and forfeiture payments represent a fair and just resolution of all issues related to the conduct described in the statement of facts.

D.      Consistent with the considerations outlined in U.S.S.G. § 8D1.1, Defendant and the government agree that there shall be no corporate probation in view of the remedial measures taken by Defendant to prevent future distribution of adulterated foods, as outlined in section VIII of the statement of facts.

E.      Defendant agrees to pay the Court's special assessment in the amount of $250 ($125 per count, *See* 18 U.S.C. § 3013) within five business days of the Court's entry of the judgment and conviction.

3.      **Defendant's Additional Obligations**

a.      The government acknowledges that the Defendant has fully cooperated with its investigation, and the Defendant acknowledges that its prior, ongoing, and future cooperation is important and a material factor underlying the decision by the government to enter into this plea agreement. Defendant therefore agrees to continue to cooperate fully with the government as may be reasonably requested in relation to the facts described in this plea agreement, subject to any protections afforded by the attorney-client privilege, attorney work product doctrine, and any other applicable legal privilege. That cooperation includes, but is not limited to, the following:

   (1)    Upon request by the government, the Defendant shall provide to the government complete and truthful non-privileged information regarding Defendant's knowledge of any and all potential criminal activities of all persons in relation to the facts described in this plea agreement. Cooperation under this Paragraph shall include that upon request of the government, the Defendant shall designate knowledgeable employees, agents, or attorneys to provide complete, truthful, and accurate information and materials to the government as described in this Paragraph;

   (2)    Upon request by the government, the Defendant shall provide all non-privileged documents, records, and other tangible evidence in Blue Bell's possession, custody, or control as may reasonably be requested by the government. Cooperation under this Paragraph shall include identification of all documents known to Defendant that may be material to any and all potential criminal activities related to the facts described in this plea agreement, including granting permission to access materials held by third parties; and

        (3)     Upon request by the government, the Defendant shall use best efforts to make available, for interviews or testimony, as requested by the government, present or former officers, directors, employees, agents and consultants of the Defendant. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with the government and law enforcement agents. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding any and all potential criminal activities related to the facts described in this plea agreement;

    b.    In exchange for Defendant's cooperation in the investigation and prosecution of other offenses related to the facts contained in the plea agreement, the government agrees that the government will not use any truthful statements, testimony or information provided by the Defendant pursuant to this agreement against the Defendant at sentencing or as the basis for further prosecution.

## 5. Factual Basis for the Guilty Plea

Defendant agrees that the government's evidence at trial would have established the following facts, which are true and correct, proving beyond a reasonable doubt each of the elements of the crimes charged:

### I. Blue Bell Background

Blue Bell is a manufacturer and distributor of ice cream products headquartered in Brenham, Texas. At all times relevant to this plea agreement, Blue Bell manufactured products at its Brenham headquarters facility as well as Blue Bell-owned and -operated facilities in Broken Arrow, Oklahoma and Sylacauga, Alabama. By February 2015, Blue Bell shipped its ice cream products in interstate commerce from its three manufacturing facilities to customers in 23 states.

Blue Bell generally operated as a direct store delivery business, controlling its products from the point of manufacture through delivery to customers. At all times relevant to this plea agreement, Blue Bell's customers included retailers such as grocery stores and convenience stores, where consumers could purchase ice cream and frozen treats, and institutional customers like schools, hospitals, and United States Department of Defense commissaries.

### II. Listeria Monocytogenes

The bacteria *Listeria monocytogenes* is an environmental pathogen that can contaminate foods and cause a mild, non-invasive illness (called listerial gastroenteritis) or a severe, invasive illness (called listeriosis). Persons who have the greatest risk of experiencing listeriosis due to consumption of foods contaminated with *Listeria monocytogenes* are pregnant women and their newborns, the elderly, and persons with weakened immune systems. Prior to the initial discovery of *Listeria monocytogenes* in Defendant's products in February 2015, as described further herein, the food industry generally viewed ice cream as presenting a low likelihood of adulteration.

### III. Blue Bell's Shipment in Interstate Commerce of Adulterated Products from Brenham

On February 13, 2015, Blue Bell received notification from officials with the Texas Department of State Health Services ("DSHS") that state officials in South Carolina had conducted tests showing that two samples of Blue Bell ice cream products tested positive for *Listeria monocytogenes*. The samples that tested positive were taken at random from an employee break room at a Blue Bell distribution center in Columbia, South Carolina as part of a South Carolina state food safety program. The two samples of Blue Bell products that tested positive for *Listeria monocytogenes* were each frozen treats manufactured on a single line at the Brenham facility, called the Gram Line, and shipped in interstate commerce to South Carolina. The first sample was a Chocolate Chip Country Cookie (two cookies sandwiching vanilla ice cream), and the second sample was a Great Divide Bar (two flavors of ice cream pre-formed onto a stick).

During this time period, Blue Bell manufactured a total of ten frozen treat products on the Gram Line, including a variety of frozen snack items sold individually in convenience stores and military commissaries, in boxes at grocery stores, and as single-serve items provided at schools and hospitals. Subsequent samples of Chocolate Chip Country Cookie and Great Divide Bar collected by South Carolina health officials from Blue Bell's Columbia, South Carolina distribution center were confirmed as positive for *Listeria monocytogenes*, which was relayed to Blue Bell by Texas DSHS officials on February 17, 2015.

Texas DSHS officials collected samples of all ten frozen treat products manufactured on the Gram Line from Blue Bell's Brenham facility beginning on February 14, 2015, after notification by South Carolina that samples of Chocolate Chip Country Cookie and Great Divide Bar tested positive for *Listeria monocytogenes*. Texas DSHS officials conducted this additional round of *Listeria* tests on products from the Brenham facility that had not yet left Blue Bell's factory. The Texas *Listeria* tests confirmed that samples of Chocolate Chip Country Cookie and Great Divide Bar and an additional sample of a product called Scoops (a single scoop of pre-formed vanilla ice cream wrapped in a package) tested positive for *Listeria monocytogenes*. The remaining seven products manufactured on the Gram Line did not test positive for *Listeria monocytogenes*. The results of the Texas DSHS testing on Gram line products were provided to Blue Bell on February 25, 2015.

### IV. Blue Bell Plant Conditions

The tests conducted by South Carolina and Texas officials in February 2015 were Blue Bell's first confirmed positive results for *Listeria monocytogenes* in its finished ice cream products. Despite not having knowledge that any of its products contained *Listeria monocytogenes* prior to February 13, 2015, Blue Bell was aware of several issues related to sanitation in the Brenham facility prior to that date.

First, at all relevant times, Blue Bell conducted coliform testing on finished product as an indicator for sanitation. Coliforms are bacteria that are not injurious to health and there is no association between the presence of coliform and *Listeria monocytogenes*. However, the presence

of coliforms in a finished food product can indicate sanitation issues at some point in the manufacturing process. Blue Bell's internal records showed that coliform testing results in Brenham periodically exceeded the Texas state standard of 40 colony forming units per gram for frozen desserts, and sometimes exceeded one hundred colony forming units per gram. Despite coliform testing results indicating sanitation issues in the Brenham manufacturing facility, Blue Bell was unable to fully identify and correct all potential root causes leading to the high coliform testing results.

Blue Bell's high coliform test results were flagged by auditors for the United States Army who conducted inspections of Blue Bell's Brenham facility. On several occasions between 2011 and 2014, Army auditors issued post-inspection reports that identified instances in which coliform counts exceeded military standards. Blue Bell Executive C initiated a trial program in 2011 to test products with high coliforms for *Listeria*. Within a month of initiating the trial program, on or about April 13, 2011, Blue Bell Executive C met with Former Blue Bell Executive A and Blue Bell Executive B. At the meeting, Executive C was directed to discontinue the *Listeria* testing program. On or about April 18, 2011, Blue Bell received the test results for an outstanding sample product test which showed a positive result for *Listeria* genus, indicating that the sample product contained one of the seventeen species of *Listeria* but not necessarily *monocytogenes*. At some point shortly after Blue Bell received the April 18, 2011 test showing a positive result for *Listeria* genus, Blue Bell employees destroyed the hard copy of the test result and deleted the electronic copy. The batch of product from which the sample was taken was shipped to customers.

The high coliform test results in finished product at the Brenham facility also resulted in formal findings in an Army inspection report in February 2013. Subsequently, there was a meeting in May 2013 between Army auditors and Blue Bell Executives B and C to discuss corrective actions for the high coliform counts identified during the audits. On June 18, 2013, Blue Bell Executive C sent an email to Blue Bell Executive B explaining that the afternoon coliform counts were high for two particular products, but that shipments of those products were already underway to Blue Bell distribution branches. Blue Bell Executive C then stated, "I'll do whatever you want to do, but if the Army or any other customer or regulatory person requires re-testing for high coliform counts, the product needs to remain on hold until results are all in to do it right." However, Blue Bell did not change its practice of shipping certain products to its distribution branches from Brenham before coliform testing results on samples from those products were confirmed and on certain occasions continued to ship products that exceeded the Texas state standard of 40 colony forming units per gram through the date of the positive *Listeria monocytogenes* test results in February 2015.

Second, Blue Bell was aware that the Brenham facility periodically had an inadequate supply of sufficiently hot water. Hot water is essential to properly clean equipment used to manufacture ice cream. The periodic lack of sufficiently hot water in the Brenham facility created instances in which the plant environment could harbor and grow bacteria.

Third, Blue Bell was aware of leaks in the Brenham facility roof that were patched or otherwise repaired over time. The leaks in the Brenham facility roof led to water periodically entering the facilities during or after rain storms, and Blue Bell was aware that leaks could introduce bacteria into the manufacturing facility. Roof leaks at the Brenham facility were

identified through late January 2015, weeks prior to the date when Blue Bell first received notice of the positive *Listeria monocytogenes* test results in February 2015.

Fourth, metal pipes that ran above product manufacturing equipment in the Brenham facility had periodic issues with condensation build up due to the temperature differences between the air in the facility and outside. In March 2015, Food and Drug Administration ("FDA") inspectors inside the Brenham facility observed condensation dripping directly into ice cream mix during the manufacturing process. Roof leaks and pipe condensation risk the introduction of contamination into the manufacturing environment. In sum, Blue Bell's Brenham facility contained insanitary conditions that could lead to the shipment in interstate commerce of products contaminated with *Listeria monocytogenes*.

### V.  Blue Bell's Withdrawal of Potentially Adulterated Products

After notification by South Carolina officials on February 13, 2015 that the initial samples of Great Divide Bar and Chocolate Chip Country Cookie tested positive for *Listeria monocytogenes*, Blue Bell did not issue any formal public notification. Blue Bell also did not issue any formal public notification after receiving notice that additional samples of Great Divide Bar and Chocolate Chip Country Cookie tested positive for *Listeria monocytogenes* on February 17, 2015. Instead, Former Blue Bell Executive A instructed Blue Bell Executive D to communicate to Blue Bell Regional and Branch Sales Managers via email and conference call to have Blue Bell Route Drivers conduct a voluntary product withdrawal. Former Blue Bell Executive A's instruction for the sales force was to remove all Great Divide Bar and Chocolate Chip Country Cookie products, as well as the other eight products made on the same Gram production line, from the market, including from all schools, hospitals, military bases, grocery stores, convenience stores, vending machine accounts and other locations over the course of the following week as they completed their regular routes. Former Blue Bell Executive A also instructed Blue Bell Executive D to inform Blue Bell Regional and Branch Sales Managers not to provide further information to Blue Bell Route Drivers regarding the reason for the product removal. On February 16, 2015, at the direction of Former Blue Bell Executive A, Blue Bell Executive D instructed Blue Bell Regional and Branch Sales Managers that "[b]ecause this situation is still under investigation, any answer to any question would be speculative. It's natural for customers to want as much information as possible, but until we learn more... the best answer is.... 'We are taking every precautionary step to remove all products in question out of the market until the full investigation is complete.'" After receiving the February 16, 2015 email, a Blue Bell sales manager sent the email to other sales managers under his supervision, instructing them, "[w]hen assisting with picking up product, don't use the words 'Recall' or 'Listeria'." Other sales managers provided instructions to "not make any mention of Listeria," and to "make sure your team refers to this as a withdrawal and not a recall."

On February 16, 2015, Blue Bell Executive D also directed Blue Bell public relations employees to draft a press release to inform customers and consumers that samples of the Great Divide Bar and Chocolate Chip Country Cookie had tested positive for *Listeria monocytogenes* and that both products were being recalled. Blue Bell Executive D provided the draft press release to Former Blue Bell Executive A on February 17, 2015. Former Blue Bell Executive A instructed Blue Bell Executive D that no press release was necessary at that time. Blue Bell Executive D asked Former Blue Bell Executive A on multiple additional occasions during that same week

whether a press release should be distributed to the public. On each of those occasions, Former Blue Bell Executive A instructed Blue Bell Executive D that no press release was necessary at that time.

On February 17, 2015, Former Blue Bell Executive E issued an additional email to Blue Bell Regional and Branch Sales Managers instructing them that they could inform any customers with "schools" or "food service accounts" who asked about the voluntary withdrawal that "the Blue Bell Country Cookie and the Blue Bell Great Divide Bar tested positive for *Listeria monocytogenes*. Both of these items were produced in Brenham on the same piece of equipment." However, Blue Bell did not provide this statement to Blue Bell Route Drivers who picked the products up from customers, and the Blue Bell Route Drivers were not told to inform customers of the positive *Listeria monocytogenes* test results. Further, on February 18, 2015, at the direction of Former Blue Bell Executive A, Former Blue Bell Executive E drafted an additional statement regarding the voluntary withdrawal. The new communication was intended for customers who requested a written statement concerning the product withdrawal. The new communication stated that "there was an issue discovered with one of our manufacturing machines. Blue Bell has made the decision to have all products that have been manufactured on this machine withdrawn from the market until further testing can be completed." This February 18, 2015 statement did not mention *Listeria monocytogenes*.

With instruction and approval from Former Blue Bell Executive A, Blue Bell Executives D and F and Former Blue Bell Executive E provided the February 18, 2015 statement in response to specific inquiries from Blue Bell Branch and Regional Managers after customers had requested a written explanation of the reason for the product withdrawal. For example, upon request for a statement from officials with a school district in Florida, a school district in Texas, and a restaurant group in Texas, each of these Blue Bell customers received a version of the statement above that referenced a problem with a "manufacturing machine" but did not mention the word "listeria" or potential contamination as the reason for the product withdrawal. At the time these customers each received the statement from Blue Bell, the specific products sold to these customers had not tested positive for *Listeria monocytogenes*. In each instance, Blue Bell had not previously informed these three customers that samples of other products from the Gram line had tested positive for *Listeria monocytogenes*. These three customers were informed of the potential contamination of Blue Bell products when a public statement was issued on March 13, 2015.

Blue Bell employees provided similar responses to verbal inquiries from customers. For example, a Blue Bell territory manager visited Hospital A in Wichita, Kansas to remove the Scoops product on or about February 17, 2015. On or about March 9, 2015, Hospital A informed Blue Bell that Hospital A had been initially told the Scoops product was removed because of "a quality issue," and more recently had been told that it was because of "a problem with the equipment used to produce the [S]coops and other some [*sic*] items." Blue Bell employees did not otherwise inform the hospital employees that the reason for the voluntary product withdrawal was the potential *Listeria* contamination until on or about March 9, 2015. On or about the same date, Hospital A informed Blue Bell that two patients at the hospital had become ill with a matching strain of *Listeria monocytogenes*, one in September 2014 and one in January 2015, and that both patients had consumed milkshakes made with the Scoops product.

Shortly after Blue Bell employees withdrew potentially contaminated products from Hospital A and other customers' shelves, Texas DSHS officials notified Blue Bell Executive C by email on February 25, 2015 that Texas DSHS tests confirmed the earlier results of the South Carolina tests regarding the presence of *Listeria monocytogenes* in samples of the Great Divide Bar and Chocolate Chip Country Cookie products. The Texas DSHS also identified that a sample of the Scoops product tested positive for *Listeria monocytogenes*.

A separate February 25, 2015 email from Texas state officials to Blue Bell Executive C included an attachment requesting more information from Blue Bell, including a "recall communication if any has issued, or a proposed communication if none has issued." Blue Bell Executive C forwarded the email and attachment to Former Blue Bell Executive A and Executive B. Subsequently, Blue Bell informed Texas DSHS officials that Blue Bell would not send out a public notification because company employees had already withdrawn the contaminated products from the market.

## VI. Blue Bell's Adulterated Products Sickened Five Hospital Patients in Kansas

On or around March 5, 2015, the Centers for Disease Control and Prevention ("CDC") identified a genetic match between the strain of *Listeria monocytogenes* identified from samples of Blue Bell Great Divide Bar, Chocolate Chip Country Cookie, and Scoops products and the strain of *Listeria monocytogenes* identified in clinical isolates from five hospital patients at Hospital A in Wichita, Kansas who suffered from listeriosis between January 2014 and January 2015. During that time period, Hospital A used Blue Bell's Scoops product to make milk shakes for patients. Hospital A also offered other Blue Bell ice cream products, including the Chocolate Chip Country Cookie and three ounce tab lid cups.

The earliest identified patient at Hospital A with listeriosis became ill over a year before Blue Bell received any notification that samples of its products were contaminated, and all five illnesses at the hospital which were later linked to Blue Bell products pre-dated February 13, 2015 (the date Blue Bell was first informed that samples of its products had tested positive for *Listeria monocytogenes*). Officials with Hospital A were notified of the link between Blue Bell products and patients sickened with listeriosis by officials with the Kansas Department of Health and Environment on or around March 9, 2015. As described above, in the weeks after February 13, 2015, Blue Bell had not previously notified Hospital A that certain samples of Blue Bell products had tested positive for *Listeria monocytogenes*. On or about March 10, 2015, Blue Bell learned that hospital employees were told that morning to immediately cease the use of Blue Bell products and to set aside Blue Bell products for pick up by Blue Bell employees.

On or around March 9, 2015, Blue Bell was also notified by the CDC and FDA of the link between the *Listeria monocytogenes* identified in samples of Blue Bell products and the clinical isolates from patients at Hospital A. Officials with the CDC and the FDA requested that Blue Bell provide a public recall announcement related to *Listeria monocytogenes* found in the Great Divide, Chocolate Chip Country Cookie, and Scoops products, which the company did on March 13, 2015. This was the first official public statement Blue Bell issued related to the earlier voluntary withdrawal of all ten products manufactured on the Gram line. After the public recall announcement on March 13, 2015 regarding the ten products manufactured on the Gram line, Blue

Bell was notified by two customers that certain Blue Bell ice cream products included in the recall were still available to consumers and being sold in their stores. Those remaining products were removed from stores after March 13, 2015.

Following identification of patient illnesses linked to Blue Bell products, FDA inspectors arrived at the Brenham facility to conduct a full inspection on March 17, 2015 and officials with the Kansas Department of Health and Environment initiated Listeria testing on Blue Bell products collected from Hospital A that were manufactured at Blue Bell's Broken Arrow, Oklahoma facility.

### VII. Blue Bell's Shipment in Interstate Commerce of Adulterated Broken Arrow Products

On or around March 22, 2015, the FDA notified Blue Bell of a positive test result for *Listeria monocytogenes* in a single sample chocolate tab lid cup taken from Hospital A by Kansas Department of Health and Environment officials on or about March 9, 2015, and manufactured at Blue Bell's Broken Arrow, Oklahoma facility. That product was shipped from Oklahoma to Hospital A in Wichita, Kansas. Blue Bell's tab lid cup product was made in chocolate, vanilla, and strawberry flavors, and was manufactured for institutional sales to hospitals, schools, and nursing homes. After Blue Bell was notified on or about March 22, 2015 that a single sample chocolate tab lid cup had tested positive for *Listeria monocytogenes*, Blue Bell initiated a recall of all tab lid cup products manufactured at the Broken Arrow facility with a corresponding public announcement on March 23, 2015. The FDA also initiated an inspection of the Broken Arrow facility on March 23, 2015.

After the positive test results at the Brenham facility, Blue Bell implemented a "test and hold" program that required all batches of finished product be placed on hold until finished product samples and food contact surface samples from the line on which the product was produced tested negative for *Listeria monocytogenes*. These tests were conducted by a third-party laboratory. On or about March 30, 2015, Blue Bell received notification from the third party laboratory that a sample taken from a quart of Rainbow Sherbet manufactured at the Broken Arrow facility tested positive for *Listeria monocytogenes*. Blue Bell determined that it had not delivered any of the Rainbow Sherbet quarts to customers because of its "test and hold program," even though certain quantities of the Rainbow Sherbet manufactured before March 30, 2015 had been shipped from Oklahoma to certain Blue Bell distribution centers in Texas and other states. Blue Bell isolated the potentially contaminated product and notified officials with the FDA of the positive test result on March 31, 2015. Because the product had been isolated and had not been shipped to any customers, Blue Bell did not issue any public announcement related to the positive *Listeria monocytogenes* test result on the sample of Rainbow Sherbet.

On or about March 31, 2015, an FDA inspector verbally notified a Blue Bell employee at the Broken Arrow facility that tests conducted by the FDA on samples of the Banana Pudding ice cream product, taken at random from the Broken Arrow facility during the ongoing inspection, had tested presumptively positive for *Listeria*. A presumptive result must have confirmatory tests run to determine if the sample is positive for *Listeria monocytogenes*, and those tests had not yet been run as of March 31, 2015. Banana Pudding ice cream was manufactured on the same line (but

not the same set of equipment) as the Rainbow Sherbet product that had returned a confirmed positive test result for *Listeria monocytogenes* on March 30, 2015. After being notified of the presumptive positive *Listeria* test result for the Banana Pudding product, Blue Bell determined on or around April 1, 2015 that certain pints of the Banana Pudding product from the same lot as the sample product that tested presumptive positive for *Listeria* had been delivered from Oklahoma to store shelves in Texas. Blue Bell stopped the further distribution of Banana Pudding product but did not withdraw or recall the Banana Pudding pints that had already been delivered to customers. Blue Bell conducted an expanded recall to include the Banana Pudding product after a confirmed positive test result for *Listeria monocytogenes* on April 6, 2015.

On April 3, 2015, Blue Bell issued a public announcement that it was closing the Broken Arrow facility for cleaning. Blue Bell did not issue an expanded recall notice for any Broken Arrow product on April 3, 2015. As of that date, the potentially contaminated Rainbow Sherbet product had not been shipped to any customers, and the presumptive positive test result for *Listeria* from a sample of Banana Pudding ice cream had not yet been confirmed as positive for *Listeria monocytogenes*. On April 3, 2015, the CDC issued a public announcement advising consumers not to eat any Blue Bell products manufactured at the Broken Arrow facility. At the time of the announcement, the CDC was aware that samples of chocolate tab lid cup and Rainbow Sherbet quart had tested positive for *Listeria monocytogenes* and that a sample of the Banana Pudding product had tested presumptive positive test for *Listeria*.

After Blue Bell's announcement of the Broken Arrow plant closure and the CDC's announcement advising consumers that they should not eat product made at that facility, certain Blue Bell customers inquired with Blue Bell about the specific reasons for the plant closure. In one example, on or about April 3, 2015, Blue Bell Executive F emailed a food safety official with a third party food service provider, a Blue Bell customer that provided Blue Bell products to schools, hospitals and nursing homes. The email from Blue Bell Executive F was intended to provide advanced notice that Broken Arrow was going to suspend operations. In response, the food safety official asked Blue Bell Executive F about the closure of the Broken Arrow facility and the CDC announcement of April 3, 2015. On April 4, 2015, Blue Bell Executive F sent a response email to the food safety official with the third party food service provider, stating that the CDC statement stemmed from potential customer illnesses related to the tab lid cup product that had already been removed from the market and, "to date, we have not been made aware by the FDA of any other items that have tested positive for listeria at any of our plants." In that email, Blue Bell did not disclose the sample of Rainbow Sherbet that had tested positive for *Listeria monocytogenes* as part of Blue Bell's test and hold program or the sample of Banana Pudding that tested presumptive positive for *Listeria* for which confirmatory tests remained pending.

On or about April 6, 2015 the FDA informed Blue Bell that it had received a confirmed positive test result for *Listeria monocytogenes* on the sample of the Banana Pudding product that had earlier tested as presumptive positive. On April 7, 2015, Blue Bell issued a public recall notice for the Banana Pudding product and any other products manufactured on that same production line. Blue Bell did not formally recall any additional products made on other lines at the Broken Arrow facility. Blue Bell did withdraw Broken Arrow products if a customer affirmatively requested Blue Bell to do so.

On April 23, 2015, FDA inspectors completed their inspection of the Broken Arrow facility. In findings issued that same date, FDA inspectors concluded, among other things, that Blue Bell had failed to manufacture and package foods under conditions and controls necessary to minimize the potential for growth of microorganisms and contamination.

### VIII. Blue Bell's Full Recall and Subsequent Voluntary Remediation

Blue Bell was notified of an additional positive *Listeria monocytogenes* test result on a product manufactured at the Brenham facility on or about April 17, 2015. Blue Bell voluntarily suspended manufacturing at all three of its manufacturing facilities and recalled all of its products still on the market. Blue Bell announced this voluntary plant closure and recall on April 20, 2015.

Following the shutdown, Blue Bell engaged in an extensive voluntary analysis of its safety and manufacturing processes. During this period, Blue Bell worked closely with federal and state regulatory authorities as well as independent experts and consultants. As part of resuming manufacturing, Blue Bell committed to implementing comprehensive food safety measures, all of which are now in place. These include, among other things: enhanced cleaning and sanitation processes at all three manufacturing facilities; significant facility improvements (including replacing floors, rerouting overhead piping to reduce condensation risk, reconfiguring equipment storage areas, upgrading air handling systems, revising foot traffic patterns, updating related controls, and investing in new manufacturing technologies); addition of detailed manufacturing date/time stamps on each finished product (including single serve items) to ensure traceability; restructuring of Blue Bell quality assurance and quality control departments; creation of separate hygienic department and sanitation department; updates to key manufacturing practices (such as hygienic zoning, cleaning and sanitation, footwear and clothing policies, and environmental and finished product testing); adoption of enhanced food safety policies, procedures, and testing programs; regular training of employees on these modernized food safety principles and practices; and the establishment of an anonymous employee hotline.

Blue Bell also instituted an enhanced environmental testing program throughout its facilities to identify early warning signs of *Listeria* in the manufacturing environment. Blue Bell also implemented a universal "test and hold" program for all finished product. Under this program, samples from all finished products are tested for *Listeria monocytogenes* and the product is not released into the market until the sample has been tested and cleared for distribution.

### 6. Government's Agreement

In exchange for Defendant's agreement to plead guilty and to waive the rights listed in this plea agreement, the government agrees it will not further criminally prosecute Defendant or its present or former corporate parents, affiliates, subsidiaries, and current directors of its corporate affiliates as of the date of signing of this agreement by Blue Bell for the conduct giving rise to the charge(s) contained in the information included as Exhibit A to this agreement and based on the facts set forth in this plea agreement.

### 7. Defendant's Related Agreement

a. **Advice of Trial Rights.** Defendant understands that Defendant has the following rights:

(1) The right to plead not guilty, or having already so pleaded, to persist in that plea;

(2) The right to a trial by jury;

(3) The rights at trial to confront and cross-examine adverse witnesses; to be protected from compelled self-incrimination (the right to remain silent); to testify and present evidence; and to compel the attendance of witnesses;

(4) The right to be represented by counsel – and, if necessary, to have the court appoint counsel at public expense – at trial and at every other stage of the proceeding.

b. **Waiver of Trial Rights.** Defendant understands that, by pleading guilty, Defendant waives and gives up the following rights: the right to plead not guilty; the right to a jury trial; the right to confront and cross-examine adverse witnesses; the right to remain silent, or to testify; and the rights to present witnesses and to compel the attendance of witnesses at trial. In addition, the Court may require Defendant to answer truthfully questions about the offenses, and Defendant may be prosecuted if Defendant knowingly makes false statements or gives false answers.

c. **Waiver of Additional Rights.** In addition to giving up the rights described above, Defendant agrees to give up and waive the following:

**Pretrial Motions:** Defendant understands that Defendant could raise a number of issues and challenges by pretrial motion, including motions to suppress evidence and to dismiss the charges against Defendant. By entering into this agreement and pleading guilty, Defendant agrees to give up any and all claims Defendant has made or might have made by pretrial motion.

**Discovery:** In addition to waiving pretrial motions, Defendant agrees to give up and waive any claims Defendant may have now or may acquire later to any information possessed by the prosecution team that might be subject to disclosure under discovery rules, including the Federal Rules of Criminal Procedure, the *Jencks* Act, local court rules, and Court Orders, including information that might be considered exculpatory or impeaching under *Brady v. Maryland* and *Giglio v. United States*. Defendant waives any continuing discovery request and additional discovery. Defendant also waives all rights to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act (5 U.S.C. § 552) or the Privacy Act (5 U.S.C. § 552a).

**Appeal:** Defendant agrees to waive and give up the right to appeal Defendant's conviction or sentence on any ground, except in a case in which the sentence imposed by the Court is greater than the maximum sentence authorized by statute.

**Statute of Limitations:** Defendant agrees to waive the statute of limitations, and any other time-related defense, to the extent applicable in this case to the charges to which it is agreeing to plead guilty under this plea agreement, provided that the guilty plea is accepted by the Court. Defendant understands and agrees that, should it withdraw its plea, if its guilty plea is not accepted by the court for whatever reason, or if its conviction is later vacated for any reason, Defendant will waive, for a period of 90 days thereafter, any statute of limitations defense to a prosecution for any criminal violation related to the conduct described herein for which the statute of limitations had not otherwise expired as of February 20, 2019.

**Collateral Attack:** Defendant agrees to waive and give up the right to challenge Defendant's conviction or sentence in a post-conviction collateral challenge, including but not limited to a proceeding pursuant to 28 U.S.C. § 2241 and 2255; except, Defendant does not waive Defendant's right to raise a challenge based on ineffective assistance of counsel and prosecutorial misconduct. If the Defendant makes a claim of ineffective assistance of counsel, Defendant will waive any claim of attorney/client privilege arising from counsel's representation.

**Attorney's Fees:** Defendant hereby stipulates and agrees that Defendant is not entitled to and shall not seek from the United States any attorney's fees Defendant incurred in connection with this prosecution.

## 8. Conclusion

### a. Collateral Consequences

Defendant understands that in addition to the punishment described above, Defendant's guilty plea and conviction may have other or collateral consequences. Defendant has discussed with Defendant's attorney the punishments and consequences of pleading guilty, understands that not all of the consequences can be predicted or foreseen, and still wants to plead guilty in this case. Notwithstanding this agreement, Defendant may continue to make legal or factual arguments related to the conduct covered in the statement of facts in litigation and other legal proceedings in which DOJ is not a party. Blue Bell will not (1) make any public statement or (2) make any statement or take any position in litigation in which any United States department or agency is a party, contradicting any statement contained in the Factual Basis for the Guilty Plea. If Blue Bell makes a public statement that in whole or in part contradicts a statement of fact contained in the Factual Basis for the Guilty Plea, Blue Bell may avoid being in violation of this Plea Agreement by promptly publicly repudiating such statement. For the purposes of this section, the term "public statement" means any statement made or authorized by Blue Bell's directors, officers, management employees, or attorneys, speaking on behalf of the company and includes, but is not limited to, a statement in (1) a press release, (2) public relations material, (3) Blue Bell website, and (4) investor communications. Notwithstanding the above, any Blue Bell entity may avail itself

of any legal or factual arguments available to it in defending litigation brought by a party other than the United States. This section does not apply to any statement made by any individual in the course of any actual or contemplated criminal, regulatory, administrative or civil case initiated by any governmental party against such individual.

### b.     Breach of Agreement

In the event Defendant violates or breaches any of the terms of the plea agreement, including Defendant's agreement to cooperate, the government will be released from its obligations under this agreement and in its sole discretion may do any or all of the following:

(1)     Move to set aside Defendant's guilty plea and proceed on charges included in the information attached as Exhibit A to this plea agreement and any additional charges;

(2)     Use against Defendant any witness statements or information Defendant provided during the course of cooperation, at sentencing or in any prosecution; and/or

(3)     Seek additional charges based on false statements, perjury, obstruction of justice, or any other criminal acts committed by Defendant before or during Defendant's cooperation, including offenses disclosed during Defendant's cooperation.

### c.     Voluntariness

In entering into this Plea Agreement, agreeing to plead guilty, and waiving the rights set forth above, Defendant understands and affirms the following:

(1)     Defendant has discussed with Defendant's attorney the charges, the possible punishment upon conviction, the evidence and any defenses to the charges, and the benefits and risks of going to trial.

(2)     Defendant has a right to plead not guilty, and by entering this agreement and pleading guilty, Defendant is waiving or giving up a number of important rights, described above.

(3)     Defendant has had sufficient time to discuss the case with Defendant's attorney, and is satisfied with the advice given by counsel.

(4)     Defendant's good judgment and ability to understand this plea agreement and its consequences are not impaired or diminished due to the use of alcohol, drugs, or medications, nor to the effect of any physical, mental, or emotional illness, disease, or injury. Defendant understands the significance of the proceedings and the importance of the decision to plead guilty and waive rights.

(5)     Defendant enters this agreement and decision to plead guilty voluntarily, and not on account of force, threats, promises or inducements, apart from the promises and inducements set forth in this agreement.

(6) Defendant agrees to plead guilty because Defendant is guilty of the offense charged.

### d. Entire Agreement

This Plea Agreement constitutes the entire agreement between Defendant and the government, and is binding only upon those parties. It does not bind any state or local prosecutor, other United States Attorney's Office or other office or agency of the United States Government, including, but not limited to, the Tax Division of the United States Department of Justice, or the Internal Revenue Service of the United States Department of the Treasury.

The parties have not made any other promises or inducements, or entered into any other agreements. The Court may accept or reject this agreement or defer a decision until after further inquiry. If the Court (1) rejects the agreement, or (2) accepts the agreement but declines to follow the agreed-upon sentence, Defendant will be informed of the Court's decision in open court and may withdraw the plea(s) of guilty entered in accordance with this agreement, or may persist in pleading guilty without a plea agreement.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
United States Department of Justice

By:

GUSTAV W. EYLER
Director
Department of Justice
Consumer Protection Branch

PATRICK HEARN
MATTHEW J. LASH
Trial Attorneys
Department of Justice

## Corporate Acknowledgement of Plea Agreement

I am duly authorized on behalf of Blue Bell Creameries, L.P. ("Blue Bell") to execute this Plea Agreement, and to take all such actions as may be necessary to effectuate this Plea Agreement. Blue Bell, through its duly authorized representatives, has read this Plea Agreement and the attached exhibit in their entirety and has discussed them fully in consultation with Blue Bell's counsel. Blue Bell acknowledges that this Plea Agreement fully sets forth Blue Bell's agreement with the United States as it relates to the charges in the Information. Blue Bell further states that no additional promises or representations have been made to Blue Bell by any official of the United States in connection with the charges in the Information.

Dated: April 30, 2020

*Samuel Sommer*
Samuel Sommer, Chief Financial Officer
Blue Bell Creameries, L.P.

*Douglas W Fellman*
Douglas A. Fellman
David I. Sharfstein
James J. Hennelly
Evan W. Guimond
Hogan Lovells US LLP
Attorneys for Defendant Blue Bell Creameries, L.P.